## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| **REGIONS BANK,** | ) |
| | ) |
|    **Plaintiff,** | ) |
| **v.** | ) |
| | ) |
| **FLORIDA INSTITUTE FOR** | ) |
| **NEUROLOGIC** | ) |
| **REHABILITATION, INC.;** | ) |
| **FINR II, INC.;** | ) |
| **FINR III, LLC;** | ) |
| **FINR III, INC.;** | ) |
| **FING II, INC.;** | )    **Civil Action No. _____** |
| **TRAUMATIC BRAIN** | ) |
| **EDUCATION ADULT** | ) |
| **COMMUNITY HOME, INC.; and** | ) |
| **JOSEPH BRENNICK,** | ) |
| | ) |
|    **Defendants.** | ) |

### PLAINTIFF'S VERIFIED COMPLAINT AND APPLICATION FOR
### APPOINTMENT OF RECEIVER, INJUNCTIVE RELIEF,
### AND OTHER LEGAL AND EQUITABLE RELIEF

**COMES NOW**, Regions Bank and for its complaint against Florida Institute for

Neurologic Rehabilitation, Inc., FINR II, Inc., FINR III, LLC, FINR III, Inc., FING II,

Inc., Traumatic Brain Education Adult Community Home, Inc., and Joseph Brennick,

states the following:

### Introduction

1.    This is an action arising out of Defendants' breach of numerous terms and

provisions contained within applicable loan documents securing repayment of five

commercial real estate loans in the aggregate principal amount of $30,720,000.00,

secured by a transitional living facility, known as "Florida Institute for Neurologic

1

Rehabilitation," together with a related skilled nursing facility known as the "Skilled Medical Rehabilitation Center at Florida Institute for Neurologic Rehabilitation," and a related assisted living facility known as "TEACH," all located in Hardee County, Florida (collectively, the "Facility").

## Parties

2.      Plaintiff Regions Bank ("Regions" or "Plaintiff") is an Alabama banking corporation with its principal place of business in Birmingham, Alabama. Accordingly, for purposes of 28 U.S.C. § 1332, Regions is a citizen of Alabama.

3.      Defendant Florida Institute for Neurologic Rehabilitation, Inc. ("FINR, Inc.") is a Delaware corporation with its principal place of business in Wauchula, Hardee County, Florida. Accordingly, for purposes of 28 U.S.C. § 1332, FINR, Inc. is a citizen of Delaware and Florida. FINR, Inc.'s registered agent for service of process in Florida is Joseph Brennick, 1962 Vandolah Road, Wauchula, Florida 33873.

4.      Defendant FINR II, Inc. is a Florida corporation with its principal place of business in Wauchula, Hardee County, Florida. Accordingly, for purposes of 28 U.S.C. § 1332, FINR II, Inc. is a citizen of Florida. FINR II, Inc.'s registered agent for service of process in Florida is Malcomb J. Pitchford, 240 S. Pineapple Avenue, 10th Floor, Sarasota, Florida 35236.

5.      Defendant FINR III, LLC is a Florida limited liability company with its principal place of business in Wauchula, Hardee County, Florida. Upon information and belief, the sole member of FINR III, LLC is Joseph Brennick, who is a citizen of Florida. Accordingly, for purposes of 28 U.S.C. § 1332, FINR III, LLC is a citizen of Florida.

2

FINR III, LLC's registered agent for service of process in Florida is Joseph Brennick, 1962 Vandolah Road, Wauchula, Florida 33873.

6.      Defendant FINR III, Inc. is a Florida corporation with its principal place of business in Wauchula, Hardee County, Florida.  Accordingly, for purposes of 28 U.S.C. § 1332, FINR III, Inc. is a citizen of Florida.  FINR III, Inc.'s registered agent for service of process in Florida is Malcomb J. Pitchford, 240 S. Pineapple Avenue, 10th Floor, Sarasota, Florida 35236.

7.      Defendant FING II, Inc. is a Florida corporation with its principal place of business in Wauchula, Hardee County, Florida.  Accordingly, for purposes of 28 U.S.C. § 1332, FING II, Inc. is a citizen of Florida.  FING II, Inc.'s registered agent for service of process in Florida is Joseph Brennick, 1962 Vandolah Road, Wauchula, Florida 33873.

8.      Defendant Traumatic Brain Education Adult Community Home, Inc. ("TEACH") is a Florida corporation with its principal place of business in Wauchula, Hardee County, Florida.  Accordingly, for purposes of 28 U.S.C. § 1332, TEACH is a citizen of Florida.  TEACH's registered agent for service of process in Florida is Joseph Brennick, 1962 Vandolah Road, Wauchula, Florida 33873.

9.      Defendant Joseph Brennick ("Brennick", and together with FINR, Inc., FINR II, Inc., FINR III, LLC, FINR III, Inc., FING II, Inc., and TEACH, collectively, "Defendants") is an individual resident of Manatee County, Florida.  Accordingly, for purposes of 28 U.S.C. § 1332, Brennick is a citizen of Florida.

### Jurisdiction and Venue

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between Regions, on the

3

one hand, and Defendants, on the other hand, and because the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

11.   Defendants are subject to personal jurisdiction in the State of Florida, and venue of this action is proper in this District, because a substantial part of the property at issue, namely, the Facility, is situated in this District. 28 U.S.C. § 1391(a)(2).

**Factual Allegations**

**A.    The Loans and Loan Documents**

**(i)    The Loan Obligations**

12.   FINR II, Inc. obtained five loans from Regions in the aggregate principal amount of $30,720,000.00 (collectively, the "Loans") pursuant to that certain Loan Agreement dated March 7, 2008 executed by and between FINR II, Inc. and Regions (the "Loan Agreement"). A true and correct copy of the Loan Agreement, together with all amendments thereto, is attached hereto as **Exhibit A.**

13.   To evidence the five Loans, FINR II, Inc. executed and delivered to Regions five promissory notes (collectively, the "Notes"), as follows:

a) an Amended and Restated Renewal Promissory Note (Loan 1) dated March 7, 2008, made by FINR II, Inc. payable to Regions in the stated principal amount of $20,600,000.00;

b) an Amended and Restated Renewal Promissory Note (Loan 2) dated March 7, 2008, made by FINR II, Inc. payable to Regions in the stated principal amount of $5,000,000.00;

c) a Promissory Note (Loan 3) dated March 7, 2008, made by FINR II, Inc. payable to Regions in the stated principal amount of $1,500,000.00;

4

d) a Promissory Note (Loan 4) dated March 7, 2008, made by FINR II, Inc. payable to Regions in the stated principal amount of $2,650,000.00; and

e) a Promissory Note (Loan 5) dated March 7, 2008, made by FINR II, Inc. payable to Regions in the stated principal amount of $970,000.00.

True and correct copies of the Notes are attached hereto as **Exhibit B**.

    **(ii)**    **The Swap Transactions**

14.    On March 5, 2008, FINR II, Inc. and Regions entered into that certain International Swap Dealers Association Master Agreement and Schedule thereto dated March 5, 2008 (together with all applicable Confirmations of Transactions, the "Swap Agreement"). True and correct copies of the Swap Agreement and all Confirmations entered into by the parties pursuant to the Swap Agreement are attached hereto as **Exhibit C**.

15.    The Swap Agreement is a separate contract between FINR II, Inc. and Regions, wholly independent of the Loans the Transactions were intended to hedge. Accordingly, the amounts due and owing under the Swap Agreement are in addition to the principal, interest, and other amounts owed by FINR II, Inc. under the Loan Agreement and Notes.

    **(iii)**    **The Guaranty Agreements**

16.    FINR, Inc. unconditionally guaranteed the full payment and performance of all of FINR II, Inc.'s obligations under the Loan Agreement, Notes, and Swap Agreement pursuant to that certain Amended and Restated Guaranty Agreement dated March 7, 2008, executed by FINR, Inc. in favor of Regions (the "FINR, Inc. Guaranty"). A true and correct copy of the FINR, Inc. Guaranty is attached hereto as **Exhibit D**.

B DJF01 1072206 v1
1039340-000113

17.     FINR III, LLC unconditionally guaranteed the full payment and performance of all of FINR II, Inc.'s obligations under the Loan Agreement, Notes, and Swap Agreement pursuant to that certain Amended and Restated Guaranty Agreement dated March 7, 2008, executed by FINR III, LLC in favor of Regions (the "FINR III, LLC Guaranty"). A true and correct copy of the FINR III, LLC Guaranty is attached hereto as **Exhibit E**.

18.     FINR III, Inc. unconditionally guaranteed the full payment and performance of all of FINR II, Inc.'s obligations under the Loan Agreement, Notes, and Swap Agreement pursuant to that certain Amended and Restated Guaranty Agreement dated March 7, 2008, executed by FINR III, Inc. in favor of Regions (the "FINR III, Inc. Guaranty"). A true and correct copy of the FINR III, Inc. Guaranty is attached hereto as **Exhibit F**.

19.     FING II, Inc. unconditionally guaranteed the full payment and performance of all of FINR II, Inc.'s obligations under the Loan Agreement, Notes, and Swap Agreement pursuant to that certain Guaranty Agreement dated March 7, 2008, executed by FING II, Inc. in favor of Regions (the "FING II, Inc. Guaranty"). A true and correct copy of the FING II, Inc. Guaranty is attached hereto as **Exhibit G**.

20.     TEACH unconditionally guaranteed the full payment and performance of all of FINR II, Inc.'s obligations under the Loan Agreement, Notes, and Swap Agreement pursuant to that certain Guaranty Agreement dated March 7, 2008, executed by TEACH in favor of Regions (the "TEACH Guaranty"). A true and correct copy of the TEACH Guaranty is attached hereto as **Exhibit H**.

6

21.     Brennick unconditionally guaranteed the full payment and performance of all of FINR II, Inc.'s obligations under the Loan Agreement, Notes, and Swap Agreement pursuant to that certain Amended and Restated Guaranty Agreement dated March 7, 2008, executed by Brennick in favor of Regions (the "Brennick Guaranty", and together with the FINR, Inc. Guaranty, the FINR III, LLC Guaranty, the FINR III, Inc. Guaranty, the FING II, Inc. Guaranty, and the TEACH Guaranty, collectively, the "Guaranty Agreements"). A true and correct copy of the Brennick Guaranty is attached hereto as **Exhibit I**.

22.     The Defendants agreed to indemnify Regions from certain environmental liabilities pursuant to that certain Environmental Indemnity Agreement dated March 7, 2008, executed by Defendants in favor of Regions (the "Environmental Indemnity"). A true and correct copy of the Environmental Indemnity is attached hereto as **Exhibit J**.

   **(iv)    The Collateral**

23.     In order to secure FINR II, Inc.'s obligations to Regions under the Loan Agreement, the Notes, and the Swap Agreement, FINR II, Inc. granted to Regions a first priority security interest in certain real property located in Hardee County, Florida (collectively, the "Real Property Collateral") described in that certain Consolidated Amended and Restated Mortgage and Security Agreement dated March 7, 2008, executed by FINR II, Inc. in favor of Regions and recorded on March 12, 2008, in the official records of Hardee County, Florida as Instrument No. 200825001965      (the "Mortgage"). A true and correct copy of the Mortgage is attached hereto as **Exhibit K**.

24.     The Mortgage was a consolidation, amendment and restatement of certain mortgages previously granted by the Defendants to Bank of America, N.A. and

7

Wauchula State Bank (the "Prior Mortgages"). All of the Prior Mortgages were assigned to Regions by that certain Assignment of Notes, Mortgages and Other Loan Documents dated March 7, 2008, executed by and between Bank of America, N.A. and Regions, recorded on March 12, 2008, in the official records of Hardee County, Florida as Instrument No. 200825001961 (the "Prior Mortgage Assignment"). A true and correct copy of the Prior Mortgage Assignment is attached hereto as **Exhibit L.**

25. As further security for FINR II, Inc.'s obligations to Regions under the Loan Agreement, the Notes, and the Swap Agreement, and as security for FINR, Inc.'s obligations under the FINR, Inc. Guaranty, FINR, Inc. granted to Regions a first priority security interest in certain personal property described in that certain Amended and Restated Guarantor Security Agreement dated March 7, 2008, executed by FINR, Inc. in favor of Regions (the "FINR, Inc. Security Agreement"). A true and correct copy of the FINR, Inc. Security Agreement is attached hereto as **Exhibit M.**

26. As further security for FINR II, Inc.'s obligations to Regions under the Loan Agreement, the Notes, and the Swap Agreement, and as security for FINR III, LLC's obligations under the FINR III, LLC Guaranty, FINR III, LLC granted to Regions a first priority security interest in certain personal property described in that certain Amended and Restated Guarantor Security Agreement dated March 7, 2008, executed by FINR III, LLC in favor of Regions (the "FINR III, LLC Security Agreement"). A true and correct copy of the FINR III, LLC Security Agreement is attached hereto as **Exhibit N.**

27. As further security for FINR II, Inc.'s obligations to Regions under the Loan Agreement, the Notes, and the Swap Agreement, and as security for FINR III, Inc.'s

B DJF01 1072206 v1
1039340-000113

obligations under the FINR III, Inc. Guaranty, FINR III, Inc. granted to Regions a first priority security interest in certain personal property described in that certain Amended and Restated Guarantor Security Agreement dated March 7, 2008, executed by FINR III, Inc. in favor of Regions (the "FINR III, Inc. Security Agreement"). A true and correct copy of the FINR III, Inc. Security Agreement is attached hereto as **Exhibit O**.

28.    As further security for FINR II, Inc.'s obligations to Regions under the Loan Agreement, the Notes, and the Swap Agreement, and as security for FING II, Inc.'s obligations under the FING II, Inc. Guaranty, FING II, Inc. granted to Regions a first priority security interest in certain personal property described in that certain Guarantor Security Agreement dated March 7, 2008, executed by FING II, Inc. in favor of Regions (the "FING II, Inc. Security Agreement"). A true and correct copy of the FING II, Inc. Security Agreement is attached hereto as **Exhibit P**.

29.    As further security for FINR II, Inc.'s obligations to Regions under the Loan Agreement, the Notes, and the Swap Agreement, and as security for TEACH's obligations under the TEACH Guaranty, TEACH granted to Regions a first priority security interest in certain personal property described in that certain Guarantor Security Agreement dated March 7, 2008, executed by TEACH in favor of Regions (the "TEACH Security Agreement" and together with the FINR, Inc. Security Agreement, the FINR III, LLC Security Agreement, the FINR III, Inc. Security Agreement, and the FING II, Inc. Security Agreement, collectively, the "Guarantor Security Agreements"). A true and correct copy of the TEACH Security Agreement is attached hereto as **Exhibit Q**.

30.    Pursuant to the Mortgage and the Guarantor Security Agreements, FINR II, Inc.'s obligations are secured by certain personal property of the Defendants, including

9

without limitation, all of the Defendants' fixtures, accounts (including healthcare insurance receivables), rents, general intangibles, instruments, inventory, equipment, money, permits, and reimbursement contracts related to the Facility, and all proceeds thereof (collectively, the "Personal Property Collateral" and together with the Real Property Collateral, collectively, the "Collateral"). The Collateral encompasses all real and personal property related to the Facility.

31.     Among other property, the Collateral includes the following licenses and/or permits from the Florida Agency for Health Care Administration ("AHCA"), the governmental agency responsible for licensing for the Facility:

- Transitional Living Facility, License No. 7006096 held by FINR, Inc.;
- Transitional Living Facility, License No. 70090967 held by FINR, Inc.;
- Transitional Living Facility, License No. 70090971 held by FINR, Inc.;
- Nursing Home, License No. 130471025 held by FINR III, LLC;
- Assisted Living Facility, License No. 8514 held by TEACH.

32.     Region's security interest in the Personal Property Collateral was perfected through the filing of the UCC-1 Financing Statements (the "Financing Statements"). The Financing Statements were filed with (i) the official records of Hardee County, Florida on March 12, 2008, as Instrument No. 200825001969; (ii) the Florida Secured Transaction Registry on March 11, 2008, as File No. 200807833957; (iii) the Delaware Secretary of State on March 11, 2008 as File No. 20080911923; (iv) the Florida Secured Transaction Registry on March 11, 2008 as File No. 200807833949; (v) the Florida Secured Transaction Registry on March 11, 2008 as File No. 200807833930; (vi) the Florida Secured Transaction Registry on March 11, 2008 as File No. 200807833965; and (vii) the Florida Secured Transaction Registry on March 11, 2008 as File No. 200807833922,

B DJF01 1072206 v1
1039340-000113

respectively. True and correct copies of the Financing Statements are attached hereto as **Exhibit R**.

33.     In connection with the Defendants' obligations to Regions, FINR II, Inc. assigned its rights in and to certain Leases, Rights, Rents, Guaranties, Damages, interests and privileges related to the Facility to Regions pursuant to that certain Consolidated Amended and Restated Assignment of Rents and Leases dated March 7, 2008, executed by FINR II, Inc. in favor of Regions, and recorded on March 12, 2008, in the official records of Hardee County, Florida as Instrument No. 200825001966 (the "Assignment of Rents"). A true and correct copy of the Assignment of Rents is attached hereto as **Exhibit S**.

34.     FINR, Inc. subordinated to the Loans its rights under its lease of the Facility pursuant to that certain Amended and Restated Subordination of Lease Agreement dated March 7, 2008, executed by and among FINR II, Inc., FINR, Inc. and Regions, and recorded on March 12, 2008, in the official records of Hardee County, Florida as Instrument No. 200825001967 (the "FINR, Inc. Lease Subordination"). A true and correct copy of the FINR, Inc. Lease Subordination is attached hereto as **Exhibit T**.

35.     FINR III, LLC subordinated to the Loans its rights under its lease of the Facility pursuant to that certain Amended and Restated Subordination of Lease Agreement dated March 7, 2008, executed by and among FINR II, Inc., FINR III, LLC and Regions, and recorded on March 12, 2008, in the official records of Hardee County, Florida as Instrument No. 200825001968 (the "FINR III, LLC Lease Subordination"). A true and correct copy of the FINR III, LLC Lease Subordination is attached hereto as **Exhibit U**.

B DJF01 1072206 v1
1039340-000113

36.     FINR, Inc. and FINR III, LLC agreed to subordinate to the Loans the Management Agreement for the Facility pursuant to that certain Subordination of Management Agreement dated March 7, 2008, executed by and among FINR, Inc., FINR III, LLC, and Regions (the "Management Agreement Subordination" and together with the FINR, Inc. Lease Subordination and the FINR III, LLC Lease Subordination, collectively, the "Subordination Agreements").   A true and correct copy of the Management Agreement Subordination is attached hereto as **Exhibit V.**

37.     For purposes of this Complaint, the Loan Agreement, Notes, Swap Agreement, Guaranty Agreements, Environmental Indemnity, Mortgage, Prior Mortgage Assignment, Guarantor Security Agreements, Financing Statements, Assignment of Rents, Subordination Agreements, and all other documents or agreements evidencing, securing, referring to, or related to the Loans, are referred to herein, collectively, as the "Loan Documents."

38.     For purposes of this Complaint, all of the of the amounts owed by Defendants to Regions under the Loan Documents, including without limitation any late fees, default interest, prepayment premiums, and swap termination fees, shall collectively be referred to herein as the "Indebtedness."   In addition to the Indebtedness, pursuant to the Loan Documents, Defendants are obligated to reimburse the Regions for costs and expenses incurred by Holder in connection with the Indebtedness, including, without limitation, attorneys' fees and other costs of collection, and costs of insuring, protecting, maintaining, or disposing of the Collateral (together with the Indebtedness, collectively, all such amounts are referred to herein as the "Obligations").

12

B.     **The Existing Defaults**

39.     Events of Default have occurred and are continuing under the Loan Documents, specifically including, without limitation, the following (collectively, the "Events of Default"):

a)     FINR II, Inc.'s failure to make payments of principal and interest when due under the Notes, including, without limitation, payments coming due in September 2012 through the present;

b)     FINR II, Inc.'s failure to make payments when due under the Swap Transactions, including, without limitation, payments coming due in August 2012 through the present;

c)     FINR II, Inc.'s failure to comply with its minimum average daily occupancy covenants in Section 5.16 of the Loan Agreement;

d)     Defendants' failure to pay their tax liabilities when they come due in violation of Section 5.3 of the Loan Agreement and Section 4(b) in each of the Guaranty Agreements, including, without limitation, by withholding payroll taxes from employees but failing to remit the same to the Internal Revenue Service and by failing to pay real property taxes for the Real Property Collateral;

e)     Defendants' default on indebtedness owed to third party vendors for the Facility in violation of Section 5.8 of the Loan Agreement and Section 4(d) in each of the Guaranty Agreements;

f)     The occurrence of a materially adverse change due to the notice provided to Defendants by the AHCA, the governmental agency responsible for licensing for the Facility, that the Facility is currently being operated in violation of Sections

13

381.74(1),   381.75(6)(b-d),   400.805(1)(c),   400.805(2)(d),   408.811(3),   of the Florida

Statutes, and Rule 64I-1.005(b-c) of the Florida Administrative Code (a true and correct

copy of AHCA's notice is attached hereto as **Exhibit W**); and

        g)     Defendants' failure to maintain the Facility in compliance with all

applicable laws, rules, and regulations as required by Sections 5.11(a) and (b) of the Loan

Agreement, specifically including, without limitation, those laws, rules, and regulations

described in the notice from AHCA described above.

      40.     Based on the various Events of Default, by letters dated September 6,

2012, November 9, 2012, November 15, 2012, December 6, 2012, and December 20,

2012, Regions notified Defendants of the Events of Default, accelerated the maturity of

the Loans, terminated the Swap Agreement, and demanded payment of the Obligations

(the "Notices of Default").  True and correct copies of the Notices of Default are attached

hereto as **Exhibit X**.  Pursuant to the Loan Documents and through the Notices of

Default, Regions revoked Defendants' rights to collect and retain the Rents and other

revenue from the Facility.

      41.     As of the date hereof, however, Defendants have failed to cure the Events

of Default or to satisfy the Obligations.

      42.     Pursuant to the terms of the Loan Documents and after applying all

reserves, as of December 21, 2012, the total amount of the Obligations equals

**$30,777,867.94** plus reasonable attorney's fees and expenses.  Interest continues to accrue

on the outstanding principal balance of the Loans.

      43.     By reason of the foregoing Events of Default, Regions has employed the

services of undersigned counsel to attempt to effect collection of the indebtedness due

B DJF01 1072206 v1
1039340-000113

Lender under the Loan Documents, to protect its security under the Loan Documents, and to institute and prosecute this action.  For such employment, Regions has agreed and become obligated to pay its counsels' fees and expenses, together with interest thereon, which Obligations are secured by the Loan Documents.

44.    As a result of the foregoing Events of Default, Regions has expended and will expend during the pendency of this action certain necessary costs, charges, and expenses of suit, including without limitation, abstracting title searches, appraisals and other third party reports and audits.  Pursuant to the terms of the Loan Documents, Defendants are obligated to reimburse Lender for all such costs, charges and expenses, which Obligations are secured by the Loan Documents.

45.    As a result of the foregoing Events of Default, and in order to protect its security in the Collateral, Regions may be required to pay during the pendency of this action certain necessary advances, including without limitation certain tax obligations and insurance coverage, for which advances Defendants are obligated to reimburse Regions, together with interest thereon, pursuant to the terms of the Loan Documents, which Obligations are secured by the Loan Documents.

**D.    Condition of the Facility**

46.    Defendants' continued possession of the Collateral and operation of the Facility puts both the patients of the Facility and Regions' interests in the Collateral at risk.

47.    Defendants' failure to pay to the Internal Revenue Service payroll taxes withheld from employees not only violates federal law but also may allow the Internal

15

Revenue Service to obtain a lien position in certain Collateral that has priority over Regions' position.

48.     Defendants' failure to pay property taxes for the Real Estate Collateral will result in the Real Estate Collateral being sold at tax sale unless those taxes are brought current.

49.     Upon information and belief, in addition to failing to pay Regions and their tax liabilities, Defendants are also failing to pay their ordinary operating expenses as they come due.

50.     Defendants' failure to operate the Facility in compliance with applicable laws, rules, and regulations jeopardizes both patient care and Regions' interests and further may result in the revocation of the Permits, closure of the Facility, and transfer of its patients to other facilities.

51.     Notwithstanding the Events of Default and the serious issues with the Facility's operation and finances, upon information and belief, Defendant Joseph Brennick, the sole shareholder of the Defendants has withdrawn at least $466,000 from the Facility since Regions sent its initial default letter on September 6, 2012, funds which, to the extent they are not needed for the Facility's operating costs, the Loan Documents require Defendants to remit to Regions.

52.     Furthermore, Defendants have admitted a significant number of patients on the basis of payment from "litigation liens" upon the proceeds of litigation by these patients against third parties related to the patients' injuries. Upon information and belief, Defendants received a litigation lien payout of $174,000 around November 20, 2012; however, Defendants did not notify Regions of the payout when it occurred and have not

16

accounted for those funds. Yet, Defendants made $228,000 in distributions to Joseph Brennick in November 2012 alone. Defendants and Regions subsequently gave notice to the attorneys for the litigation lien patients by letters dated December 14, 2012.

53.     Defendants have informed Regions that they expect a significant litigation lien payout in excess of $2 million within the next two weeks. However, based on Defendants' history of failing to pay the Facility's obligations in deference to Joseph Brennick's shareholder distributions, a real danger exists that the Defendants will siphon these litigation lien proceeds from the Facility to further support pay-outs to Joseph Brennick at the expense of the Facility and its creditors.

E.     **Contractual Remedies**

54.     Pursuant to the terms and provisions of the Loan Documents, the lien of which extends to all rents, issues, income, accounts, proceeds, profits and revenues arising out of or in connections with the Collateral, Regions, upon filing of this Complaint, is entitled to the immediate appointment of a receiver of the Collateral, and the rents, issues, income, accounts, proceeds, profits and revenues thereof, as additional security and as a matter of strict right to Regions, and without reference to the adequacy of the value of the Facility, or to the solvency of the Defendants, all as more particularly set forth in the Loan Documents.

55.     As the holder of the Loan Documents and the owner of the liens, security interests, and rights under the Loan Documents, Regions is entitled to (i) the right to receive payment due under the Notes; (ii) the right to receive the outstanding indebtedness evidenced by the Notes; and (iii) the right to enforce the terms and provisions contained within the Loan Documents.

17

56. All conditions precedent to the maintenance of this action have been performed.

57. In this action, Regions is seeking:

a) appointment of a receiver to oversee, administer, and manage the Facility pending the foreclosure or other disposition of the Collateral and to exclude Defendants and their agents, servants and employees wholly from the Facility;

b) temporary, preliminary, and permanent injunctive relief prohibiting Defendants from disbursing, collecting, disposing, and converting any rents, royalties, issues, profits, revenue, income, leases, security deposits, other deposits, or other proceeds of any kind whatsoever, derived, generated, or related to or from the Collateral (collectively the "Rents"), directing Defendants to account for all such Rents they have collected since September 6, 2012, and further directing Defendants to remit all such Rents to the duly appointed receiver, as described and qualified herein, pending further order of this Court;

c) a temporary, preliminary, and permanent injunction restraining and enjoining Defendants from collecting, transferring, disposing, wasting, and converting the Rents and other collateral securing the indebtedness owed;

d) damages for breach of contract under the Loan Documents and for conversion of the Rents;

e) recovery of its reasonable attorneys' fees and expenses; and

f) such other and further relief the Court may deem just and appropriate under the circumstances.

18

## Count I
## Appointment of a Receiver

58.    Regions incorporates by reference the allegations set forth above as if set forth fully herein.

59.    Pursuant to FED R. CIV. P. 66, the Court may appoint a receiver upon application by a party in writing.

60.    A duly appointed receiver is an officer of the Court whose powers are set forth by 28 U.S.C. § 959(b) and 28 U.S.C. § 754 (in pertinent part), which provide,

> [A] trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which the property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

28 U.S.C. § 959(b).

> A receiver appointed in any civil action or proceeding involving property, real, personal or mixed, situated in different districts shall, upon giving bond as required by the court, be vested with complete jurisdiction and control of all such property with the right to take possession thereof.

> He shall have capacity to sue in any district without ancillary appointment
> . . . .

28 U.S.C. § 754.

61.    Upon the appointment of a receiver for property, real, personal or mixed, the territorial jurisdiction of the Court shall extend to any judicial district in which receivership property is found. *See* 28 U.S.C. § 1692.

62.    In furtherance of his duties, a duly appointed receiver may sell property in his possession whether such property is located in the district where the receiver was appointed or another district. In particular, unless the Court directs that the sale occur in

another district, real or personal property in the possession of a duly appointed receiver may be sold by public sale in the district where the receiver was appointed. *See* 28 U.S.C. § 2001. Such sale shall be made upon notice prescribed by 28 U.S.C. § 2002. *See* 28 U.S.C. § 2002. The Court may also order a private sale of real or personal property in the possession of the receiver upon such terms and conditions as the Court approves, if it finds that the best interests of the estate will be conserved thereby. *See* 28 U.S.C. § 2001.

63.     Pursuant to the Federal Rules of Civil Procedure, this Court has the power to appoint a receiver over the Facility, and the appointment of a receiver to manage and operate the Facility is just and necessary in this case for the reasons described in Plaintiff's Emergency Motion for Appointment of Receiver and Incorporated Supporting Memorandum of Law filed contemporaneously herewith.

64.     Section 3.6 of the Mortgage provides that upon the occurrence of any Event of Default, Regions' remedies include, without limitation, the appointment of a receiver without notice to Defendants.

65.     Regions requests that the Court appoint Daniel McMurray (the "Receiver") of Focus Management Group USA, Inc. ("Focus") as the Receiver for the Facility.

66.     The Declaration of Daniel McMurray (the "Receiver Declaration") attests more fully to Mr. McMurray's qualifications as a receiver and a true and correct copy is attached hereto as **Exhibit Y**. Regions has not received the original of the Receiver Declaration but will file the original with the Court as soon as possible upon receipt.

67.     Regions requests that the Receiver shall, at Defendants' expense, have all of the usual powers and duties of receivers in similar cases, including, without limitation,

20

the full power to hold, develop, rent, lease, manage, maintain, operate, market, sell and otherwise use or permit the use of the Collateral, subject to Regions' approval, including without limitation the power and authority to (collectively, the "Receiver's Powers"):

      a)    Enter on and take possession of the Collateral, including taking immediate operating control and management of the Facility and all Collateral and securing all Collateral, wherever located, including without limitation changing the locks on buildings owned or occupied by Defendants, and denying access to same by any representative, employee or agent of Defendants as deemed necessary by Receiver;

      b)    Exclude Defendants and their agents, servants and employees wholly from the Facility;

      c)    Conduct the operation of the Facility at all times in accordance with customary and ordinary industry standards in order to maintain the standard of care for the patients/residents of the Facility, including without limitation providing all services required and necessary for patient/resident care;

      d)    Operate the Facility in compliance with applicable Federal and State laws and regulations relating thereto and cause all permits, reimbursement contracts, and any other agreements necessary for the use and operation of the Facility or as may be necessary for participation in the Medicaid, Medicare, or other applicable reimbursement programs to remain in effect without reduction in the number of licensed beds authorized for use in the Medicaid, Medicare, or other applicable reimbursement programs;

      e)    Inspect, photocopy and/or take immediate control of any and all books, records and other data relating to the Collateral, the Facility, and the operations thereon;

      f)    Verify the accuracy and completeness of Defendants' financial statements and records and other information;

      g)    Collect, transfer and receive all Rents, revenues, security deposits, healthcare insurance receivables and other accounts receivable or proceeds of any Collateral (collectively, the "Cash Collateral") and deposit same in the bank account(s) established by Receiver and upon which Receiver shall be the sole authorized signatory (the "Receiver Accounts");

      h)    Receive, demand, collect and preserve all Rents and all other sums, accounts, or other amounts due and owing, or to become due, to Defendants;

      i)    Take possession of and receive from any and all banks and/or savings and loan associations any monies and funds on deposit in said banks and/or savings and loan associations in the name of Defendants and deposit such funds into the Receiver Accounts;

21

j)      Pay all taxes, including property taxes, payroll taxes, bed taxes (if any) and all other applicable regulatory fees and expenses;

k)      Investigate and confirm that the Facility and the Collateral is adequately insured and to use reasonable efforts to cause the Receiver, in its capacity as Receiver, to be named as an additional insured party on existing liability and property damage insurance policies on the Collateral and the Facility and, if needed, expend Cash Collateral to obtain customary insurance coverage for the Facility and the Collateral in amounts the Receiver deems reasonably fit or proper;

l)      Purchase all necessary food, beverage, medical, cleaning and other supplies, equipment, furniture and furnishings and contract for all necessary services at the Facility;

m)      Apply the Cash Collateral to the necessary expenses of operating and preserving the Collateral and the Facility including, without limitation, employee wages, taxes, utilities, insurance premiums, existing contracts and debt service obligations on the Collateral and the Facility and remit to Regions all Cash Collateral that constitute collateral of Regions for application to the indebtedness of Defendants under the Loan Documents, to the extent not expended for the operation of the Facility or as otherwise authorized by the Court;

n)      Incur indebtedness as may be necessary for the operation and/or preservation of the Collateral and the Facility, provided that written consent of Regions shall be required to the extent that such debt may impair Regions' rights in the Collateral and that any advances of funds by Regions at the request of the Receiver shall be entitled to a senior lien on assets of the Defendants, including but not limited to the Collateral;

o)      Maintain inventory and equipment at the Facility as is necessary to operate the Facility in accordance with Federal and State regulations;

p)      Subject to Regions' review and approval, plan, supervise and conduct a program of regular maintenance and repair at the Facility to ensure that all improvements and equipment located on or used or useful in connection with the Facility remains in good repair and operating condition as necessary to operate the Facility in accordance with Federal and State regulations;

q)      Prepare a monthly operating statement and balance sheet and other reports as necessary to accurately describe the sources and uses of income, census and other pertinent statements regarding the financial condition of the Facility;

r)      Speak with Defendants and any other persons regarding the Collateral, the Facility, and the business operations at, and the financial condition of, the Facility;

s)      Employ Focus to assist with the performance of the services of the Receiver contemplated herein and such other contractors, subcontractors, materialmen, architects, engineers, attorneys, consultants, managers, brokers, marketing agents, or

22

other employees, agents, independent contractors or professionals, as Regions may in its sole discretion deem appropriate or desirable to implement and effectuate the rights and powers granted therein;

t)   Subject to Regions' consent, engage a qualified, licensed third party operator for the Facility (the "Administrator"), who will report exclusively to the Receiver and who will be paid such amounts as the Receiver may negotiate with the Administrator;

u)   Recruit, train and supervise all other necessary employees at the Facility;

v)   Institute and amend from time to time general salary scales, personnel policies and appropriate fringe benefits for all employees at the Facility, which may include pension and profit sharing plans, insurance benefits and holiday, vacation, personal leave and sick leave policies;

w)   Provide performance standards for each employee category or level and evaluate the performance of each employee no less frequently than annually;

x)   Furnish to the Facility any and all policy manuals needed with reference to the operation of the Facility and revise said policy manuals as is needed from time to time to ensure that the Facility complies with all applicable State and Federal laws, regulations and requirements;

y)   Institute standards and procedures for admitting patients/residents, for charging patients/residents for services, and for collecting the charges from the patients/residents or third parties;

z)   Make, cancel, enforce or modify contracts, leases, or licenses relating to the Facility provided however that, except as otherwise ordered by the Court after notice and a hearing, the Receiver shall not cancel or impair any State or Federal license necessary to operate the Facility;

aa)   Maintain all licenses and monitor price and cost reimbursement or payment levels in the service area of the Facility and where appropriate seek approval of appropriate changes to patient rates or payment schedules applicable to the Facility;

bb)   Negotiate and enter into in the name of and on behalf of Defendants such agreements, contracts and orders as it may deem necessary or advisable for the furnishings of services, concessions and supplies for the operation and maintenance of the Facility;

cc)   Analyze and determine the best approach to maximize value from the Collateral and the Facility for the benefit of Defendants' creditors and interest holders, including without limitation, marketing and selling the Facility as a going concern pursuant to the powers granted by and procedures proscribed in 28 U.S.C. §§ 2001 et seq.;

B DJF01 1072206 v1
1039340-000113

dd)    Execute and deliver, as attorney-in-fact and agent of Defendants or in Defendants' own name, such documents and instruments as are necessary or appropriate to consummate authorized transactions;

ee)    Implement a quality assurance program which shall include regular audits of resident care in the following areas: (i) dietary services; (ii) housekeeping; (iii) laundry; and (iv) maintenance of educational programs, including without limitation reviewing the actual services provided at the Facility, maintenance of a continuing education program to enhance the proficiency of the Facility's staff, and technical assistance to the Facility's staff in addressing problem areas discovered during the course of quality assurance audits;

ff)    Analyze all transfers made by Defendants to any related entities or persons related to Defendants, and all transfers received by Defendants from any other entity or person related to the Defendants;

gg)    Investigate all books, records and data to determine the sources and uses of any such transfers, the presence of undisclosed debts or obligations of Defendants;

hh)    Investigate the status of the Defendants' compliance with Federal and State laws and regulations governing the operation of the Facility as a transitional living facility;

ii)    Conduct a complete and thorough analysis (and reconstruction, if necessary) of the accounts payable of Defendants;

jj)    Conduct a complete and thorough analysis (and reconstruction, if necessary) of the accounts receivable and other claims of Defendants and the documents and materials that support the same;

kk)    Prepare such financial reports for current or prior time periods as may be necessary or advisable;

ll)    Institute ancillary proceedings in this State or other States as are necessary to preserve and protect the Collateral and the Facility or any other assets of the receivership estate;

mm)    Do all things reasonable and necessary to promote the sound and reasonable financial management of the Collateral and the Facility and be responsible for the performance of all acts reasonably necessary in connection with the operation and management of the Facility in an efficient, cost-effective and proper manner;

nn)    Do any acts which Regions in its sole discretion deems appropriate or desirable to protect the security hereof and use such measures, legal or equitable, as Regions in its sole discretion deem appropriate or desirable to implement and effectuate the provisions of the Mortgage.

24

68.     The Receiver should be authorized to apply the revenues collected by such Receiver in connection with the management and operation of the Facility first to the Receiver's compensation as ordered below; second to the other costs and expenses of the receivership, including any management fees, attorneys' fees and other out-of-pocket expenses incurred by the Receiver in connection with the receivership; third to the costs of operating, maintaining and repairing the Facility (including but not limited to customary salaries and expenses of non-site employees of the Receiver, but excluding all salaries and expenses of all employees, agents and affiliates of the Receiver whose duties are not limited to operation or management of the Facility); fourth to repay all sums advanced to the Receiver by the Regions; fifth to payment of expenses of the Facility; including but not limited to payment of real and personal property taxes, insurance, water and sanitation bills and operating expenses; sixth whenever sufficient funds are available for such purpose, the Receiver shall make principal and interest payments toward any loans which are secured by a lien on the Facility; if such other loans were authorized under the terms and conditions of the Loan Documents, in the order of their priority, including but not limited to the Notes and Loan Documents held by Regions in this action; and seventh to a fund to be held by the Receiver in an interest-bearing account pending further order of this Court.

69.     Pursuant to Section 3.6 of the Mortgage, and as a result of Defendants' failure to meet their obligations under the Loan Documents as set forth above, including without limitation, the Events of Default, Regions is entitled to apply for appointment of the Receiver.

B DJF01 1072206 v1
1039340-000113

70.     Regions asserts that the Receiver is necessary to take control of the Collateral to receive and manage the Rents, to prevent further conversion, waste and diminution, as described below, in value of the Collateral, to maintain adequate patient care at the Facility in compliance with all applicable laws, rules, and regulations, and to protect the interest of Regions in the Collateral.

71.     In light of Facility's condition, as explained above, Regions believes there is an urgent need to protect the value of the Facility from imminent danger of loss, diminished value, and squandering, through this Court's appointment of a receiver for the Facility so that Holder can provide the money necessary, in Regions' discretion, to address these critical repair items without becoming exposed to mortgagee-in-possession liability issues.

72.     Regions reserves the right to make future requests that the Court expand the Receiver's Powers should the same be deemed necessary.

73.     Regions requests that receipts received from the operation of the Facility be applied to reimburse the Receiver for all reasonable costs and expenses that it (or its delegates) incur as a result of serving as receiver, for payment of insurance premiums and management fees authorized thereunder, to compensate Receiver for its services as receiver, and for payment of all Obligations; provided, however, the amounts paid to the Receiver or its delegates, other than compensation paid to the Administrator or professionals retained by the Receiver, for reasonable costs and expenses and for compensation shall not to exceed $40,000.00 per month in the aggregate unless authorized by Regions in writing.  Regions requests that compensation paid to the Administrator and professionals retained by the Receiver shall not be subject to the above

26

cap, but that the Court provide that it will review the compensation to the Administrator and such professionals for reasonableness upon motion of any of Regions or the Defendants.

74.     Regions requests that this Court enter its order providing that Receiver shall be paid a fee of $300 per hour, subject to the cap in the preceding paragraph (the "Receiver Fee").

75.     Regions requests the Receiver be authorized to remit to Regions all funds, proceeds and Rents that constitute collateral of Regions for application to the indebtedness of Defendants under the Loan Documents, to the extent not expended for any of the purposes herein authorized and to include a necessary reserve for working capital.

76.     Regions requests that the Court enter its order setting forth the process for paying the Receiver Fee to the Receiver from the operations of the Collateral.

## Count II
### Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction

77.     Regions incorporates by reference the allegations set forth above as if set forth fully herein.

78.     Pursuant to the provisions of the Loan Documents and the Regions' revocation of Defendants' right to collect the Rents, Regions is entitled to collect the Rents and apply the same in accordance with the Loan Documents.

79.     Regions has made demands for Defendants to turn over the Rents and cease collecting future Rents, but Defendants has failed and refused to acknowledge the same.

B DJF01 1072206 v1
1039340-000113

80.   Defendants have failed to apply the Rents in accordance with the provisions of the Loan Documents, including its failure to make monthly payments as required under the Loan Documents and the failure to pay the taxes and operating costs of the Facility, while at the same time making substantial distributions to shareholders.

81.   Regions reasonably believes its interest in the Rents is endangered and likely to be lost or rendered inadequate without the entry of injunctive relief requiring payment and escrow of the Rents to the Receiver.

82.   Therefore, in addition to the rights granted Regions under the Loan Documents, the equities dictate that Regions be granted a temporary restraining order and, upon hearing, a preliminary and permanent injunction:

a)   prohibiting the Defendants from interfering with the duties of the Receiver and/or Regions;

b)   prohibiting Defendants from disbursing, collecting, disposing, and converting any Rents;

c)   directing Defendants to account for all such Rents they have collected since September 6, 2012;

d)   further directing Defendants to remit all such Rents to the duly appointed Receiver; and

e)   restraining and enjoining Defendants from collecting, transferring, disposing, wasting, and converting the Rents and other collateral securing the indebtedness owed.

83.   Regions will suffer immediate and irreparable injury, loss, and damage unless Defendants are restrained and enjoined as requested hereunder.

B DJF01 1072206 v1
1039340-000113

84.    Moreover, Regions is likely to prevail on the merits of this Complaint and the balance of equities favors entry of the requested equitable relief.

85.    Unless such equitable relief is granted by the Court, the injuries, losses, and damages to Regions cannot be remedied by money damages alone.

86.    Because Regions has no adequate remedy at law and there is a substantial likelihood that it will prevail on the merits of this Complaint, the equitable relief sought herein is appropriate.

87.    Regions is willing to post a reasonable bond, should the Court set such bond.

## Count III
## Breach of Contract – Defendants

88.    Regions incorporates by reference the allegations set forth above as if set forth fully herein.

89.    Defendants executed their respective Loan Documents, under which they are each liable for the Obligations due to Regions.

90.    Regions is the holder of the Loan Documents and is entitled to enforce the Loan Documents.

91.    Under the Loan Documents, Defendants are obligated to Regions for payment of all Obligations. Defendants have failed to pay the outstanding Obligations due and owing to Regions.

92.    Defendants have breached their obligations to Regions under the Loan Documents by failing to pay to Regions the full amount of the Obligations.

B DJF01 1072206 v1
1039340-000113

93. Pursuant to the terms of the Loan Documents and after applying the tax, insurance, replacement reserve and insurance loss deposit balances, Defendants are indebted to Regions for **$30,777,867.94** plus reasonable attorney's fees and expenses.

94. Accordingly, Regions demands judgment against Defendants, jointly and severally, for breach of contract under the Loan Documents in an amount not less than **$30,777,867.94** together with all accruing interest and costs, including without limitation, default interest, prepayment premiums, attorneys' fees, and all expenses incurred by Regions in collecting the Obligations.

**Count IV**
**Conversion**

95. Regions incorporates by reference the allegations set forth above as if set forth fully herein.

96. Defendants executed the Loan Documents, including the Mortgage, the Assignment of Rents, and the Guarantor Security Agreements, whereby all Rents generated by the Facility were conveyed, transferred, and assigned to Regions.

97. Regions is the owner of the Loan Documents and entitled to enforce same, including exercising its rights in all Rents generated by the Facility.

98. Pursuant to the terms and conditions of the Loan Documents, Defendants were permitted to collect, receive, and utilize the Rents but only so long as no Event of Default exists.

99. Events of Default have occurred and are continuing under the Loan Documents.

100. Thus, Defendants' conditional license to collect, receive, and utilize the Rents lapsed on September 6, 2012, upon the occurrence of the Events of Default.

30

101.   Regions has demanded that Defendants fully comply with all of its Obligations under the Loan Documents, which Obligations include turnover to Regions of all post-default Rents.   Regions hereby renews and reiterates its demand that Defendants immediately turnover to Regions all Rents generated by the Facility from and after the September 6, 2012 Event of Default (the "Post-Default Rents").

102.   Defendants have failed and refused to turnover and deliver the Post-Default Rents to Regions, and have instead converted same to Defendants' own purposes.

103.   Defendants' actions in wrongfully possessing and exercising dominion over the Post-Default Rents, in defiance of Regions' ownership rights in same, have resulted in damages to Regions.

104.   Accordingly, Regions demands judgment against Defendants, jointly and severally, for all Post-Default Rents, plus all accruing interest and costs, including without limitation, all costs, expenses, and attorneys' fees incurred by Plaintiff in enforcing it rights in and to the Rents.

### Prayers for Relief

**WHEREFORE**, Regions respectfully requests the following relief:

1.   That the Court appoint Daniel McMurray of Focus Management Group USA, Inc. as Receiver to take possession of the Collateral with responsibilities and authorities consistent with the Receiver's Powers as set forth in accordance with the terms of the proposed order attached hereto as **Exhibit Z**; and

2.   That the Court grant Regions and/or the duly appointed Receiver injunctive relief which, among other things: (i) enjoins the Defendants from interfering with the duties of the Receiver and/or Regions; (ii) directs the payment of all Rents,

31

receipts and revenues to the receiver and/or Regions; and (iii) provides all other relief as requested herein and as may be necessary to preserve and protect the Collateral and in aid of the duties conferred on the receiver and/or Regions by this Court; and

3.     That the Court, if requested, direct the Receiver to administer the Collateral in a manner which will not jeopardize the operation of the Facility, while maximizing the amount realized by Regions from the Collateral; and

4.     That the Court enter judgment in favor of Regions against Defendants, jointly and severally, in an amount not less than **$30,777,867.94**, plus interest accrued through the date of judgment, plus interest which shall accrue after the date any judgment entered in this case until such judgment is satisfied in full, including default interest, plus any and all escrows, taxes, costs, fees, prepayment or yield maintenance premiums and charges, including attorneys' fees and expenses, to the fullest extent to which Regions is entitled under the Loan Documents; and

5.     That the Court enter judgment in favor of Regions against Defendants, jointly and severally, in the amount of all Post-Default Rents, together with all accruing interest and costs, including attorneys' fees and expenses incurred by the Regions in enforcing its rights in and to the Rents, to the fullest extent to which Regions is entitled under the Loan Documents; and

B DJF01 1072206 v1
1039340-000113

6.     For any such other, further, or different relief to which Regions may be entitled.

Respectfully submitted this 4th day of January, 2013.

Zachary Bancroft
Florida Bar No.: 0145068
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
Bank of America Center
390 North Orange Avenue
Post Office Box 1549
Orlando, Florida 32802
Telephone:  (407) 422-6600
Facsimile: (407) 841-0325
Email:  zbancroft@bakerdonelson.com

AND

Timothy M. Lupinacci
Alabama State Bar No. ASB-7626-L64T
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
420 North 20th St., Ste. 1400
Birmingham, AL  35203
Telephone:  (205) 328-0480
Facsimile: (205) 322-8007
Email:  tlupinacci@bakerdonelson.com

**Attorneys for Plaintiff Regions Bank**

33

## VERIFICATION

I, William P. Carroll, Senior Vice President of Regions Bank ("Regions"), and one of the custodians of the business records of Regions, having first being duly sworn, and being authorized to make this statement, do make oath that I am an adult citizen competent to testify to the matters stated herein, that I have read the foregoing Complaint and have examined the documents attached as Exhibits thereto, and that, based upon my personal knowledge of the facts stated therein and upon my review of the records of Regions that were kept as a regular practice of Regions in the course of Regions' regularly conducted business activity and that were made at or near the time of the occurrence of the matters set forth, the facts stated in the Verified Complaint are true, and the documents attached as Exhibits are accurate copies of the records of the regularly conducted activity of Regions.

REGIONS BANK

By: _____

William P. Carroll
Senior Vice President

STATE OF ALABAMA
COUNTY OF JEFFERSON

Before me, _Clanae D. Bivins_____ of the state and county mentioned, personally appeared William P. Carroll, with whom I am personally acquainted, or proved to me on the basis of satisfactory evidence, and who, upon oath, acknowledged such person to be an officer of other representative authorized to execute the instrument of Regions Bank, and that such officer/representative as such, he executed the foregoing instrument for the purpose therein contained, by personally signing his name as Senior Vice President of the corporation.

Witness my hand and seal at office in _Jefferson County, Alabama_ this _31st_ day of _December_, 201_2_.

_Clanae D. Bivins_____
NOTARY PUBLIC
My Commission Expires: __6/28/13_____       [SEAL]

34